Daniel JOHNSON, Plaintiff,

v.

**TEXAS DEPARTMENT OF CRIMINAL JUSTICE, et al., Defendants.**

Civ. A. No. A–85–CA–094.

United States District Court,
W.D. Texas,
Austin Division.

Dec. 1, 1995.

Douglas M. Becker (Court appointed), Gray & Becker, Austin, Texas, for Plaintiff.

Adrian Young, Assistant Attorney General, Daniel E. Maeso, Assistant Attorney General (both of the Law Enforcement Defense Division of the Texas Attorney General, Dan Morales. Jorge Vega, First Assistant Atty. Gen., Drew T. Durham, Deputy Atty. Gen., Criminal Justice, and Ann Kraatz, Chief of the Law Enforcement Defense Division.), Attorney General's Office, Austin, Texas, for Defendants.

## AMENDED MEMORANDUM OPINION [1]

CAPELLE, United States Magistrate Judge.

Based upon the pleadings, the evidence presented, and the parties' arguments, this

1. This amended opinion clarifies certain points, analyzes the statutes governing protest state- ments and furloughs in light of the statutes' amendment effective September 1, 1995, and

memorandum opinion is hereby entered granting relief to the class of all inmates of the Texas Department of Criminal Justice—Institutional Division ("TDCJ–ID"), having Daniel Johnson as its class representative, against Defendants,[2] being the members of the Texas Board of Pardons and Paroles and the members of the Texas Board of Criminal Justice, all having been sued in their official capacities, on the issues of the Texas Board of Pardons and Paroles' ("Board")[3] receipt and consideration of inmates' writ-writing activities and the Board's receipt of protest letters when making parole determinations. Relief is hereby denied to the Plaintiff class on its claim against the Texas Board of Pardons and Paroles' consideration of an inmate's furlough history when making parole determinations. The parties consented to this Court's jurisdiction under 28 U.S.C. § 636(c).

## I. *PROCEDURAL HISTORY*

Plaintiff, Daniel Johnson, an inmate of the TDCJ–ID, submitted this *pro se* civil rights action on February 19, 1985, which was filed on February 26, 1985 after leave to proceed *in forma pauperis* was granted. On July 6, 1986, a prior United States Magistrate Judge issued a report and recommendation, which the District Court adopted, dismissing the Plaintiff's claims for failure to state a claim and for failure to exhaust state remedies. On July 17, 1987, the Fifth Circuit Court of Appeals reversed this dismissal and remanded the cause for further proceedings. *Johnson v. Pfeiffer,* 821 F.2d 1120 (5th Cir.1987) ("*Johnson I* ").

On June 20, 1988, counsel was appointed to represent the Plaintiff. Plaintiff's Fourth Amended Complaint was filed on September 7, 1988. Defendants filed their Amended Answer on October 14, 1988. Daniel Johnson originally asserted five (5) causes of action based on violations of constitutional rights under both the United States and Texas Constitutions and rights protected by 42 U.S.C. § 1983. On November 26, 1991, the parties consented to this Court's jurisdiction under 28 U.S.C. § 636(c) to enter final orders and judgment in the case.

Defendants filed a Motion to Dismiss or, in the Alternative for Summary Judgment on March 10, 1989, and a second such motion on March 13, 1989. On December 18, 1991, this Court entered an order granting Defendants' motions for summary judgment as to Plaintiff's claims that a Texas sentencing statute (requiring that more of a sentence be served for certain aggravated offenses or offenses

---

responds to Plaintiff's Motion to Alter or Amend Judgment filed November 13, 1995.

**2.** In his original complaint, Plaintiff sued Neal Pfeiffer, (then) Chairman of the Board of Pardons and Paroles, and other (then) members of the Board (Ruben Torres, Connie Jackson, Winona Miles, Antonio Morales), all sued in their official and individual capacities. In his First Amendment of Complaint, filed March 8, 1985, Plaintiff added the State of Texas as a defendant. In the live complaint, Plaintiff's Fourth Amended Complaint, filed on September 7, 1988 (Doc. # 78), he sues the Board of Pardons and Paroles and the members of the Board of Pardons and Paroles in their official capacities only. The State of Texas is no longer named as a party defendant. By motion filed on April 11, 1990, Plaintiff requested leave to substitute certain parties, stating that, as of January 1, 1990, under Texas Revised Civil Statutes Annotated article 4413(401), the powers, duties, obligations, property and records of the Texas Board of Pardons and Paroles were transferred to the Texas Board of Criminal Justice. Based thereon, under Federal Rule of Civil Procedure 25(d), by order filed April 24, 1990, the successor Texas Board of

Criminal Justice and its members in their official capacities and the Board of Pardons and Paroles and its members in their official capacities were ("Defendants"). Since that date, successors to Board members who have ceased to hold office have been substituted automatically under Rule 25(d). Also by that same April 24, 1990 order, the style of the case was changed to *Daniel Johnson v. Texas Board of Criminal Justice, et al.* Citations to witness testimony reflects the witness's position at the time he or she testified.

Rule 4413(401) was repealed in 1991 and is now found in Texas Government Code § 491.001 *et seq.* This Court disagrees that article 4413(301) pulled all authority from the Board of Pardons and Paroles and placed it in the Texas Board of Criminal Justice. Texas Government Code § 491.001 shows that the Board of Pardons and Paroles is a separate entity with separate authority by defining the Board as the entity having power provided by Texas Code of Criminal Procedure article 42.18. Tex.Gov't Code § 491.001 (Vernon Supp.1996).

**3.** When referring to the Texas Board of Criminal Justice, either its entire name or the abbreviation TBCJ will be used.

involving a deadly weapon) had been routinely applied in an *ex post facto* manner and that Defendants had failed to set a tentative parole month and to propose a program of measurable institutional progress for Plaintiff and other inmates. The Court denied Defendants' motions for summary judgment as to Plaintiff's three remaining claims, which included causes of action based on violations of constitutional rights under both the United States and Texas Constitutions, and rights protected by 42 U.S.C. § 1983, being: 1) Defendants retaliate against inmates who file habeas corpus actions, civil rights actions, and other litigation by subjecting such inmates to harsher treatment in parole considerations; 2) Defendants consider "protest" letters received from trial officials, victims, and citizens when making parole decisions; and 3) Defendants invidiously discriminate against inmates who are not Texas residents by considering the prior award of furloughs as a factor favoring parole when out-of-state residents are, as a practical matter, precluded from being awarded such furloughs.

On January 28–31, 1992, the Court heard Plaintiff's Amended Motion for Class Certification. The testimony and exhibits admitted at that hearing have been incorporated into the record of the trial on the merits. The Court entered an order certifying this litigation as a class action pursuant to Rule 23, Federal Rules of Civil Procedure, on February 11, 1992. The class of all present and future inmates of the TDCJ–ID was certified for prospective, injunctive relief. That order was amended on March 25, 1992 to reflect that the class was certified under Fed. R.Civ.P. 23(b)(1) and (b)(2).

On April 22, 1992, Plaintiff filed his Motion for Partial Summary Judgment and Brief in Support seeking judgment on two of the three remaining issues: that Defendants retaliate against writ-writing inmates and that Defendants invidiously discriminate against non-resident inmates who are not "eligible" for furloughs, and thus have not completed one, by considering a furlough completion as a positive factor favoring parole.

On May 11, 1992, Defendants filed their Supplemental Motion to Dismiss, or Alternatively, for Summary Judgment with Supporting Brief and Response to Plaintiff's Motion for Summary Judgment. On June 5, 1992, this Court ordered that, after consideration of the pending motions, evidence should be submitted on the issues presented, and held the motions in abeyance pending the outcome of the trial of this cause. Trial before the Court proceeded on June 9–12 and June 23–26, 1992, and July 16, 1992, at which time testimony concluded. Approximately sixty-three witnesses testified and more than two hundred exhibits were introduced.

Plaintiff filed a Post–Trial Brief on July 24, 1992. Defendants filed a Post–Trial Brief under Seal and Amended Post–Trial Brief under Seal on August 12, 1992 and August 17, 1992, respectively. Plaintiff filed a Reply to Defendants' Amended Post–Trial Brief on August 20, 1992, and submitted a proposed memorandum opinion. Defendants filed Proposed Findings of Fact and Conclusions of Law on July 8, 1994. Both parties submitted several letter briefs.

## II. *WRIT WRITERS*

### A. *Plaintiff's Argument*

Plaintiff and the Plaintiff class allege that inmates who have initiated and prosecuted civil rights and habeas corpus actions against the Texas Department of Criminal Justice and other state officials, on their own behalf or on behalf of other inmates, have been discriminated against during parole consideration. There is alleged to be a retaliatory and customary practice of the Defendants to deny parole to "writ writers."

### B. *Defendants' Argument*

■ In response, Defendants assert that the evidence fails to demonstrate retaliation against any inmate in the parole review process because of that inmate's legal activities.[4]

---

4. Plaintiff's witness, Neil Pfeiffer, who served for more than six years on the Parole Board and served as Chairman during the time most of the plaintiff's inmate witnesses assert that they were unconstitutionally denied parole, but who was not Chairman at the time of trial, testified that he was not aware of any inmate whose parole was negatively affected because of his legal activities. Neil Pfeiffer, Trial Transcript, June 23, 1992, at 28–29.

**1212**

They claim that, although some inmates have expressed a belief that they are retaliated against in the parole review process because of their legal activities,[5] the evidence demonstrates that the only effect an inmate's legal activities may have on his parole is favorable in that it is considered to advance an inmate's educational development and to be an industrious use of the inmate's time while in prison.[6] Defendants claim that the absence of a specific written Board rule prohibiting the negative consideration of an inmate's legal activities is neither factually nor legally relevant,[7] but in fact, a TDCJ Administrative Directive prohibits retaliation against inmates for legal activities.[8] Additionally, the absence of a formal written Board policy concerning writ-writing has not "chilled" inmates' use of the courts or the TDCJ's grievance system to express their legal complaints.[9] Even assuming any chilling effect, federal decisional law does not establish a constitutional deprivation without an actual intentional act of retaliation for an inmate's legal activity, for which Defendants cite

*Jackson v. Procunier,* 789 F.2d 307 (5th Cir. 1986). As a final argument, Defendants claim that the parole officials do not know nor care if inmates are writ writers, given that Board members review and vote on over 70,000 cases annually,[10] making retaliation a practical impossibility.[11]

### C. Analysis

■ Despite the Defendants' arguments, historically there has been a bias against inmates considered to be writ writers by the employees of the Texas Department of Corrections (TDC), now the Texas Department of Criminal Justice—Institutional Division (TDCJ–ID).[12] This Court determines that there should be a Board rule which definitely prohibits the consideration of an inmate's legal activities when the Board determines that inmate's candidacy for parole. To do anything less restricts, at least as a practical matter, an inmate's access to the courts. *Ex Parte Hull,* 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034 (1941). Finding a right of access

5. An inmate's mere suspicion of retaliation is insufficient to establish a claim of unconstitutional treatment. *Richardson v. McDonnell,* 841 F.2d 120, 122 (5th Cir.1988).

6. Testimony of John Escobedo (former Parole Commissioner), Trial Transcript, June 25, 1992, at 6–9, 17–18; testimony of Steven Farmer (Parole Examiner), Trial Transcript, June 26, 1992, at 221.

7. An additional Board rule on the same subject would be superfluous and unnecessary. Testimony of Board Chairman Jack Kyle, Trial Transcript, June 23, 1992, at 154–55, 236.

8. Texas Department of Criminal Justice (TDCJ) Administrative Directive 3.81, dated September 22, 1986 (Defendants' Trial Exhibit 61), prohibits retaliation against inmates because of their legal activities. Testimony of Andy Collins, Director of TDCJ–ID, Trial Transcript, June 24, 1992, at 250–55. On cross-examination, however, Collins agreed that an inmate would have to be aware of entries within his parole file regarding writ writing activities in order to make use of the grievance procedure, and that inmates have no access to the information within their parole files. *Id.* at 290–92.

9. TDCJ–ID inmates presently file in excess of 100,000 internal grievances and about 2,000 lawsuits per year. Defendants' Proposed Findings of Fact.

10. Defendants' Trial Exhibit 82, TDCJ 1990 Annual Report.

11. Testimony of Winona Miles, Board Member, Trial Transcript, June 24, 1992, at 157; Jack Kyle, Trial Transcript, June 23, 1992, at 153–54, 229; John Escobedo (former Parole Commissioner), Trial Transcript, June 25, 1992, at 6–9, 24; Daniel Downs, Board Member, Trial Transcript, June 26, 1992, at 172, 182; Steven Farmer (Parole Examiner), Trial Transcript, June 26, 1992, at 219, 225, 230, 232–33; Neil Pfeiffer, Trial Transcript, June 23, 1992, at 29.

12. *See e.g., Ruiz v. Estelle,* 679 F.2d 1115, 1153 (5th Cir.1982). *See also,* testimony of Chairman Jack Kyle, Trial Transcript, June 23, 1992, at 233, 237–38; testimony of former Chairman Neil Pfeiffer, Trial Transcript June 23, 1992, at 29–32; testimony of former Board Member Chris A. Mealy, Trial Transcript, June 25, 1992 at 191; testimony of William T. Habern, Plaintiff's expert, Trial Transcript, June 26, 1992, at 7–9.

Indeed, the evidence fairly and overwhelmingly supports the conclusion that far too many Board members and employees believe that an inmate's filing a habeas corpus action or any other legal action to challenge a conviction shows the inmate's failure to accept responsibility for the crime, and actions challenging the conditions of confinement show the inmate's failure to demonstrate satisfactory institutional adjustment.

by prisoners to the federal courts, the Supreme Court held:

> The state and its officers may not abridge or impair petitioner's right to apply to a federal court for a writ of habeas corpus. Whether a writ of habeas corpus addressed to a federal court is properly drawn and what allegations it must contain are questions for that court alone to determine.

*Hull,* 312 U.S. at 549, 61 S.Ct. at 642.

■ Nor may Texas prohibit inmates from assisting each other in preparing writs and other legal documents. *Johnson v. Avery,* 393 U.S. 483, 484, 487, 89 S.Ct. 747, 748–50, 21 L.Ed.2d 718 (1969) (prohibiting inmates from assisting other prisoners, as a practical matter, prevents illiterate prisoners from having their claims heard). The right of access to the courts, by allowing inmates to assist other inmates, was extended to include actions brought under 42 U.S.C. § 1983. *Wolff v. McDonnell,* 418 U.S. 539, 578–79, 94 S.Ct. 2963, 2986, 41 L.Ed.2d 935 (1974). The Court stated in *Wolff* that "[t]he right of access to the courts, upon which *Avery* was premised, is founded in the Due Process Clause and assures that no person will be denied the opportunity to present to the judi-

ciary allegations concerning violations of fundamental constitutional rights." *Id.* at 579, 94 S.Ct. at 2986. [13]

■ Given inmates' constitutional right of access to the courts, any consideration of writ writing as a factor in the parole decision is a deprivation of due process, and Defendants do not contend otherwise. Such consideration also violates the equal protection clause. *City of Cleburne, Texas v. Cleburne Living Center, Inc.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985) (equal protection requires that similarly situated persons be treated alike). Any distinction made between inmates who seek access to the courts and those who do not violates the equal protection clause. Further, "prison officials may not retaliate against or harass an inmate for exercising the right of access to the courts...." *Woods v. Smith,* 60 F.3d 1161, 1164 (5th Cir.1995).

■ The Board has no rule or policy prohibiting the consideration of an inmate's litigation activities in the parole decision process.[14] If any Board member or Board employee did in fact consider writ writing activities, no violation of a Board rule would occur, and no disciplinary action could be taken

---

13. *See also, Bounds v. Smith,* 430 U.S. 817, 821–22, 97 S.Ct. 1491, 1494–95, 52 L.Ed.2d 72 (1977); *Foster v. City of Lake Jackson,* 28 F.3d 425, 429 (5th Cir.1994); *Crowder v. Sinyard,* 884 F.2d 804, 811 (5th Cir.1989); *Roberson v. Hewes,* 701 F.2d 418, 420 (5th Cir.1983).

14. Plaintiff's expert witness, William T. Habern, former staff counsel for inmates at the TDC, testified that there are no written rules dealing with the subject of writ writers. Class Cert.Hrg.Transcript, at 187. Board Member Winona W. Miles testified that she has seen litigation material in parole files and that there is no Board policy regarding how to deal with that information. Class Cert.Hrg.Transcript, at 588–89; Trial Transcript, June 24, 1992, at 80, 137, 149. Board Member Kenneth N. Coleman testified that there is no policy concerning writ writers. Class Cert.Hrg.Transcript, at 621, 654. Former Parole Commissioner Helen Copitka testified that she was aware of inmate litigation activities contained within parole files during the time that she served as Parole Commissioner. Class Cert.Hrg.Transcript, at 831–32. She also testified that other parole commissioners used that information in a negative manner. *Id.* at

832–33. Further, during the time that she served as Commissioner there was no policy preventing litigation activities from being considered in the parole decision process. *Id.* at 833.

Former Chairman Neil Pfeiffer testified that the Board had no policy regarding writ writers and that consideration of writ writing activity would violate no policy of the Board during the time that he served. Trial Transcript, June 23, 1992, at 28–29. James A. Collins, Director, TDCJ–ID, testified that there is no rule to prevent employees from including information regarding litigation activities within parole files. Trial Transcript, June 24, 1992, at 294. *See also* testimony of Robert Owens, Division Director, TDCJ—Pardons and Paroles Division, Trial Transcript June 24, 1992, at 321, 322; testimony of Board Member John Escobedo, Trial Transcript, June 25, 1992, at 8; testimony of Board Member Frank C. Eikenburg, Trial Transcript, June 25, 1992, at 66–67; testimony of former Chairman James H. Granberry, Trial Transcript, June 25, 1992, at 110; testimony of former Board Member Chris A. Mealy, Trial Transcript June 25, 1992, at 189, 191, 192; testimony by deposition of Board Member, Honorable Wendell A. Odom, Trial Transcript, July 16, 1992, at 77.

against the Board member or employee.[15] Although the evidence is circumstantial, because no representative of Defendants will admit that writ writing activities are considered when making parole decisions,[16] there is no other reasonable explanation for the tremendous weight of testimony showing that writ writing activities are frequently discussed in parole interviews and that documentation of such activities frequently appears in inmates' parole files.[17]

15. Winona W. Miles testified that if Board members considered litigation activities in reaching a parole decision that no Board policy would be violated. Class Cert.Hrg.Transcript, at 590; Trial Transcript, June 24, 1992, at 80. Board Member Kenneth N. Coleman testified to that same effect. Class Cert.Hrg.Transcript, at 621. TDCJ—Pardons and Paroles Division Director Robert Owens testified that inclusion of writ writing activities in an inmate's parole file would violate no policy. Trial Transcript, June 24, 1992, at 321, 322. Board members testified that no Board member or employee has ever been disciplined for improper consideration of litigation activity. *See* testimony of Board Member Kenneth N. Coleman, Class Cert.Hrg.Transcript, at 621, 653; testimony of Neil Pfeiffer, Trial Transcript, June 23, 1992, at 31–35.

16. The circumstantial nature of this evidence does not preclude its use in finding a constitutional violation. *See generally, McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (proof of civil rights violations is routinely based upon inferences drawn from objective factors).

17. Robrady Adams testified that Board Member Daniel L. Downs inquired in a 1991 parole interview whether Adams had any pending litigation. Trial Transcript June 9, 1992, at 54–55. Downs denied recalling asking Robrady Adams about his litigation activities in 1991, Trial Transcript, June 26, 1992, at 171; however, on cross examination Downs admitted that he had no independent recollection of the interview with Adams, *id.* at 197, 200, nor could he recall Adams' name when initially asked about the allegations, *id.* at 197, given the number of interviews he conducts (approximately one hundred face to face interviews with inmates per week), *id.* at 194.

Thomas H. Baranowski was told by Kenneth N. Coleman in 1990 and by Parole Examiner Hensen in 1989 that his litigation activities did not look good on his record. Trial Transcript June 10, 1992, at 232, 237. Mark Fields was told in 1984 by then Commissioner Coleman, that "being in the law library was a bad place to be." Trial Transcript, June 9, 1992, at 178. Commissioner Escobedo made negative comments about Fields' litigation activities in 1985 and 1988. *Id.* at 180. Charles Hicks testified that Commissioner Evans told him that his litigation activities made him a troublemaker. Trial Transcript, June 9, 1992, at 137–39. Larry Casey testified in January, 1992, that Board Member Coleman stated in a parole interview, "So you're going to see us in Federal Court, Bubba." Class Cert.Hrg.Transcript, at 431. Casey also testified that Board Member Escobedo asked him whether he was still participating in this litigation. *Id.* at 430.

Inmate Kenneth G. Thompson testified that Board Member Daniel L. Downs told him that he needed to complete a vocational course, despite the fact that Thompson informed Downs that he was enrolled in a paralegal course. Thompson was told that a paralegal course "doesn't count." Trial Transcript, June 11, 1992, at 507–08. Downs denied telling Inmate Thompson that he needed to take a vocational course and that a paralegal course would not count. Trial Transcript, June 26, 1992, at 173. Thompson also testified that he filed a lawsuit against TDCJ–ID employees for retaliation in connection with his writ writing activities. Trial Transcript, June 11, 1992, at 510–13. Plaintiff's Trial Exhibit No. 62A includes a copy of the Compromise and Settlement Agreement from that lawsuit, which includes a provision requiring that Thompson "shall not be harassed, intimidated, threatened, nor in any way retaliated against by any official or employee of the TDC or anyone acting in their behalf for [his] legal activities." *Id.* at 517. Plaintiff's Trial Exhibit No. 62B contains a disciplinary action against Thompson which was directly related to his legal activities.

Plaintiff's Trial Exhibit No. 52 details the settlement of litigation filed by inmate Terrance R. Spellmon. In exchange for the dismissal of some fifteen lawsuits, Assistant Attorney General Demetri Anastasiadis agreed to write letters to Spellmon's present and future wardens, as well as to the Board stating that Spellmon had dismissed his suits. Trial Transcript, June 10, 1992, at 103–04.

Inmate Robert Delgado testified that his parole officer warned him to stop his "ambulance chasing." Trial Transcript, June 11, 1992, at 725. This was a reference to Delgado's continuing to assist inmates with their litigation during the time that he was out on parole. *Id.* Inmate Roman Angel testified that Assistant Warden Richard Jones, on the Hightower Unit, told him to quit his writ writing or Jones would speak to Board Member Daniel L. Downs and have Angel's parole denied. Trial Transcript, June 9, 1992, at 284–89.

The evidence also establishes that information regarding inmates' writ writing activities is contained within their parole files. Chairman Jack Kyle testified that in at least one instance he saw a parole file which contained "indications ... that this person had been referred to as a writ writer." Class Cert.Hrg.Transcript, at 692–93. Inmate James W. Bright, through his deposition, testified he is a writ writer and that "writ writer"

Plaintiff and the Plaintiff class members obviously believe that litigation activity bodes poorly for their chances of parole.[18] Clearly, this perception of retaliation has chilled, at least to some extent, inmates' exercise of their constitutionally protected right of access to the courts.[19] Plaintiff's expert witnesses testified that a rule against consideration of writ writing activities would be acceptable.[20]

The uncontroverted evidence is that there is no Board policy or rule to prohibit the unconstitutional consideration of an inmate's exercise of the right of access to the courts. The overwhelming weight of the circumstantial evidence shows that inmates are questioned about such activities and that litigation material, as well as information about legal activities, appears in parole files. The evidence shows, as Board Member Eikenburg candidly testified, that "suing the Parole Board is not the way to go about getting out of prison."

> is a derogatory term indicating that "you're a trouble maker from the word go." Trial Transcript, July 16, 1992, at 19–20. He also testified that copies of his litigation material were included in his file. *Id.* at 20–21, 22.
>
> Board Members Kenneth N. Coleman and Winona W. Miles testified that they have seen litigation documents within the parole files. Class Cert.Hrg.Transcript, at 626 and 588, respectively. Board Member, Honorable Wendell A. Odom, stated in his deposition that he had also seen litigation material in inmates' files. *See* Plaintiff's Trial Exhibit No. 98, at 47. Additionally, Defendants' Trial Exhibit No. 51 includes a case summary prepared by Board Member Connie Jackson which refers to Inmate George Hall as being "quite litigious." The parole file of Plaintiff Daniel Johnson contains numerous references to his legal activities. *See* Plaintiff's Trial Exhibit No. 75, at Bates numbers 000235, 000239, 00291, 00330, and 00340.

18. Plaintiff's evidence at trial includes a videotape of a newscast interview with Board Member Frank Eikenburg on February 12, 1992, shortly after the class certification. In commenting on this suit, Mr. Eikenburg stated that, "I'm not sure that suing the Parole Board is the right way to go about getting out of prison." *See* Plaintiff's Trial Exhibit No. 60; Trial Transcript June 25, 1992, at 47–48.

19. Inmate John Gray testified pursuant to a subpoena that he refused to accept his legal mail in an effort to improve his chances for parole. Trial Transcript, June 11, 1992, at 735. Helen

The Board shall adopt by rule a policy that prohibits consideration of inmates' exercise of the constitutionally protected right of access to the courts. The rule shall specify that such activity is wholly irrelevant to the parole decision making process. The rule will apply prospectively to all inmates considered for parole after the date of the original opinion.[21] The rule adopted by the Board shall establish specific, enforceable sanctions for all violations of this policy.

A formal, publicized means shall be established for inmates questioned about their writ writing activities or those inmates who have reason to believe that this Board policy has been violated to bring such questions to the attention of the Board. All existing files shall be reviewed for and purged of any and all documentation related to an inmate's litigation activity as the specific inmate becomes eligible for review. Only upon the written request of an inmate shall any litigation material or information be included or retained in his or her parole file.

> Cassidy, Staff Attorney for the 14th District Court of Appeals in Houston, Texas, testified that numerous inmates had dismissed appeals of their convictions due to a belief that pending litigation would hamper their chances for parole. Trial Transcript, June 10, 1992, at 423–26. She testified that it would be helpful to have a rule prohibiting the consideration of an appeal to dissuade inmates from this belief. *Id.* at 428–29.

20. Former Chairman Neil Pfeiffer, former Chairman James H. Granberry, and former Board Member Chris A. Mealy all supported the adoption of such a prohibition. Trial Transcript, June 23, 1992, at 31; Trial Transcript, June 25, 1992, at 111; and Trial Transcript June 25, 1992, at 191; as did Plaintiff's expert witness William T. Habern. Trial Transcript, June 26, 1992, at 10, 15. Board Member Daniel L. Downs testified he would not be opposed to such a rule and it would not interfere with the exercise of his discretion. Trial Transcript, June 26, 1992, at 184.

> Board Member Frank C. Eikenburg opposed such a rule, stating that it would have the effect of *increasing* the consideration of litigation activities in the parole-making decision. Trial Transcript, June 25, 1992, at 68. Former Board Member Honorable Wendell A. Odom testified such a rule might diminish the independence of Board members. *See* Plaintiff's Trial Exhibit No. 98, at 95–97.

21. The original opinion was filed and entered in the docket of this case on November 1, 1995.

## III. *PROTEST LETTERS*

### A. *How the System Works*

Texas law directs the Board to consider two basic factors in deciding whether to grant parole to an inmate: the seriousness of the offense and the likelihood of a favorable parole outcome.[22] Texas law also requires the Board of Pardons and Paroles to notify certain trial officials and certain other members of the public when inmates are under consideration for parole.[23] Although the parole process has changed slightly over the years, it works as follows.

Most inmates are reviewed for parole consideration by a panel of three. The first panel member often (but not always) interviews the inmate at the institution and writes a summary of the interview for inclusion in the inmate's parole file. The first panel member then "votes the case" by indicating on the docket sheet in the file whether he or she favors release on parole. The second panel member then receives the file and votes the case without an interview. If the first two panel members disagree, the file then goes to the third member for the dispositive vote. If the first two panel members agree, the case does not go to the third member.

If the panel votes against release on parole the inmate receives a form notice from the Board listing reasons for the unfavorable decision. If the panel votes in favor of release, the inmate is notified of that fact and is told that the decision is tentative and may be rescinded, depending upon the Board's further investigation. The inmate receives a notice known as an "F.I." (further investigation).

At a point in time roughly contemporaneous with the panel's consideration of an inmate's case, the Board sends out notification to the persons entitled to receive notice under the statute. Many of the recipients then send protests to the Board in varying forms: some are simply form letters indicating opposition to release, some express opinions that the inmate has not done enough time for the crime, others contain newspaper clippings or first-person narratives describing the original crime. Other letters come from victims and their families describing the effects that the crime has had upon them, while others include information about the inmate, such as his criminal history, unadjudicated offenses, and family circumstances. Motives for sending letters vary widely from a concern for the safety of the general public, personal dislike of an inmate, local political considerations, and a desire to obtain an advantage over an inmate.

After September 1, 1995, the Texas Code of Criminal Procedure was amended to allow for victims or their representative to present oral statements to board members. Now, the parole panel "shall allow one person to appear in person before the board members to present a statement of the person's views about the offense, the defendant, and the effect of the offense on the victim." Tex. Crim.Proc.Code Ann. art. 42.18, § 8(f)(2) (as amended by Act of May 29, 1995, 74th Leg., R.S., ch. 253, § 1, 1995 Tex.Sess.Law Serv. 2179 (Vernon)).[24] This new requirement allowing persons to appear before "board members" appears to conflict with Texas Criminal Procedure article 42.18, § 7(e), which was not amended as of September 1, 1995, and states that "[t]he members of a panel are not required to meet as a body to perform the members' duties as prescribed by this article, except to conduct a hearing as required by Section 14 of this article [parole revocation hearings]." Tex.Crim.Proc.Code ann. art. 42.18, § 7(e) (Vernon Supp.1996). In an attempt to read the statutes as not in conflict, presumably a victim or his representative could appear before any of the three

---

**22.** *See* Tex.Crim.Proc.Code Ann. art 42.18 § 8(f)(5).

**23.** *See* Tex.Crim.Proc.Code Ann. art. 42.18 §§ 8(f)(2) and (3), and § 8(h).

**24.** The words "statements," "written statements," and "protest letters" are all used in the statutes discussed in this opinion. This Court will refer to all terms and uses the terms to mean statements, whether written or oral, in letter form or otherwise, intended to protest against the release on parole of an inmate parole candidate. The term "victim impact statement" is a separate term of art and is not used in this opinion in a shortened form; when such a document is referred to, the words "victim impact statement" are used.

panel members, but appear separately, could appear before two of the three panel members, or the panel could opt to meet as a body to hear victims or their representatives.

### B. Plaintiff's Argument

As alleged in Plaintiff's Fourth Amended Complaint, the Board of Pardons and Paroles is statutorily required to consider two factors in deciding whether to grant parole to an inmate. These factors are the likelihood of harm to the public and the likelihood of a favorable parole outcome. Protests received by the Board are often unrelated to these factors. The evidence at trial proves that protests are often motivated by personal dislike and local political considerations. Plaintiff's constitutional rights are violated when unreliable, malicious, or irrelevant protest letters are the basis for the Board's decision. Plaintiff has alleged, and the evidence has proven, that inmates who are eligible for parole and who receive protest letters are treated differently from those inmates who are eligible for parole and who do not receive protest letters. The Board's lack of policy has resulted in a system that is arbitrary and capricious. By adopting a parole system with general standards of eligibility, the State of Texas has created a justifiable expectation that parole will be granted fairly.

Plaintiff argues that he is entitled to judgment on his claim that the use of protest letters in Defendants' parole decision-making procedure violates Plaintiff's right to due process and equal protection under the laws.

### C. Defendants' Arguments

Defendants assert that Plaintiff has failed to show the Board's consideration of protest letters gives rise to a fundamentally unfair

parole review process in Texas or to demonstrate a single case wherein the consideration of a protest letter by the Board has unfairly resulted in the denial of parole. Defendants claim that the Texas Constitution and Code of Criminal Procedure mandate that victims and other persons be allowed to submit information to the Board for consideration in the parole review process, citing Article 3, § 30, Tex. Constitution (Crime Victims' Bill of Rights);[25] and Article 42.18, §§ 8(e), (f), (g), (h), § 9 and § 18, Texas Code of Criminal Procedure. Further, Texas has not created a constitutional or statutory right for convicted felons to be apprised of the contents of protest letters or to any particular procedure by which they may challenge the same. Such a procedure cannot be implemented without negating the right of confidentiality of victims.[26] Neither statute nor case law has created exceptions to Article 42.18, § 18, the statute which prevents disclosure of "all information ... obtained and maintained in connection with inmates of the institutional division subject to parole ...," including protest letter information.

Defendants assert that cases involving protest letters constitute a relatively small percentage of the total number of parole cases reviewed, and in only a very small percentage can it be said that a protest letter has negatively affected an inmate's parole consideration.[27]

Defendants argue that the Board must exercise a much broader and less easily defined range of discretion,[28] and that the Board is not only permitted but is required to consider all available and useful information, citing Article 42.18, § 8(a). They assert that the record does not show Board members considering and weighing protest letters

---

**25.** Presumably, Defendants' citation to Article 3, § 30 is a typographical error; Article 1, § 30 of the Texas Constitution contains the Crime Victims' Bill of Rights.

**26.** See Jack Kyle, Trial Transcript, June 23, 1992, at 187–89; Andy Collins, Trial Transcript, June 24, 1992, at 258–64; Raven Kazen, Board employee, Trial Transcript, June 25, 1992, at 158–61, 177.

**27.** See Defendants' Trial Exhibit 66; Plaintiff's Trial Exhibit 38; Raven Kazen, Trial Transcript,

June 25, 1992, at 152–57, 175–78; Bob Owens, Trial Transcript, June 24, 1992, at 315; Winona Miles, Trial Transcript, June 24, 1992, at 138. This statistical evidence indicates less than ½ of 1% of the total number of cases reviewed are negatively affected by a protest letter.

**28.** See Jack Kyle, Trial Transcript, June 24, 1992, at 45 (recross); Winona Miles, Trial Transcript, June 24, 1992, at 86–88, 136, 143, 168–74; John Escobedo, Trial Transcript, June 25, 1992, at 20–22.

in a manner devoid of common sense and reason; instead, the evidence demonstrates that the Board members' use of discretion when considering protest letters is generally well-informed, balanced, and in harmony with the constitutional and statutory duties of Board members.[29]

Defendants argue that a formal administrative hearing process established to investigate and verify protest letter information would be unnecessary, costly and impractical,[30] unfair to victims of crime, and not in the overall best interest of society. Given the relatively infrequent negative affect of a protest letter in a parole decision, a formal system-wide investigative and hearing process would achieve little benefit for inmates, would greatly impact victims' and others' interests in confidentiality and personal security,[31] and might chill the use of protest letters.[32] Defendants claim that the present informal method of treatment of protest letter information is reasonable, based as it is on common sense in light of Board members' considerable experience in evaluating protest letters and other information.[33]

■ Defendants assert that *de facto* conditions, such as prison overcrowding resulting in the early release of some inmates, do not create a reasonable expectation of parole. A liberty interest in parole may be created only by specific mandatory language, contained either in a statutory or constitutional provision, neither of which has been promulgated in Texas, citing *Kentucky Dept. of Corrections v. Thompson,* 490 U.S. 454, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989) and *Jackson v. Cain,* 864 F.2d 1235, 1250–51 (5th Cir.1989).[34]

## D. The Evidence at Trial

The evidence at trial shows that inmates who receive protest letters of any kind are treated differently from inmates who do not. As more fully stated below, no rule exists regulating how protest letters are used in the parole decision process; there is no verification of information contained in said letters; protest letters containing the same information as prior letters, or not having any new information, are relied upon as containing new information; and protest letters containing wrong information, that are vindictive, or that are the result of political pressure, are considered and relied upon.

The Board has no rule or policy regarding the use of protest letters in the decision-making process.[35] Some of the Board members who testified said that they completely ignored protests that merely expressed the opinion that an inmate had not done enough time,[36] others said that they would consider

29. *See* Jack Kyle, Trial Transcript, June 24, 1992, at 70–72 (redirect).

30. *See* Bob Owens, Trial Transcript, June 24, 1992, at 308–11.

31. *See* Jack Kyle, Trial Transcript, June 23, 1992, at 189–95; Andy Collins, Trial Transcript, June 24, 1992, at 258–64.

32. *See* Testimony of Ellen Halbert, TDCJ Board Member, Trial Transcript, June 24, 1992, at 214–19, 226–27; Raven Kazen, Trial Transcript, June 25, 1992, at 159–61; Norbert Schlegel (relative of a victim), Trial Transcript, June 24, 1992, at 196–99.

33. *See* Jack Kyle, Trial Transcript, June 23, 1992, at 176–86, 250, 257–8; Winona Miles, Trial Transcript, June 24, 1992, at 86–88, 143–44; John Escobedo, Trial Transcript, June 25, 1992, at 13–16.

34. Subsequent to the trial and the parties' briefing, the United States Supreme Court has ruled that the correct method of analysis when determining whether a state has created a liberty interest in a certain prisoner right, which is now allegedly being curtailed by a statute or regulation, is to focus on the nature of the deprivation, not on the actual language of the particular state statute or regulation causing the alleged deprivation. *Sandin v. Conner,* —— U.S. ——, ——, 115 S.Ct. 2293, 2299, 132 L.Ed.2d 418 (1995).

35. Testimony of Kenneth N. Coleman, Class Cert.Hrg.Transcript, at 620 and 628; Oral Deposition of Kenneth N. Coleman, at 56; testimony of Jack Kyle, Class Cert.Hrg.Transcript, at 726; testimony of Winona W. Miles, Class Cert.Hrg.Transcript, at 591–592; Oral Deposition of Winona W. Miles, at 34, 58–59; Plaintiff's Trial Exhibit No. 98, at 26–27; Plaintiff's Trial Exhibit No. 44, at 83; Plaintiff's Trial Exhibit No. 45, at 72–74; and testimony of Helen Copitka, Class Cert.Hrg.Transcript, at 834.

36. Testimony of Winona W. Miles, Trial Transcript, June 24, 1992, at 81; testimony of James H. Granberry, Trial Transcript, June 25, 1992, at 107; testimony of Chris A. Mealy, Trial Transcript, June 25, 1992, at 194; testimony of Daniel L. Downs, Trial Transcript, June 26, 1992, at 188–89.

such a protest to be new and pertinent information,[37] some members testified that they would consider only protests that contained new and pertinent information,[38] but they differed as to what information they would consider to be new and pertinent.

While no Board member or employee could cite any policy served by decisions based upon inaccurate information, at present the Board has no process to verify information contained within protest letters or to resolve inaccuracies.[39] In general, the information in protests is simply assumed to be correct.[40]

Defendants' argument has been that only protests containing "pertinent, useful, and ordinarily reliable information" are used in the parole decision process is not supported by the record. The evidence at trial establishes that protests containing no new information and repeating information given in previous protests have a clear negative effect upon the Board's decision to release on parole.[41] Favorable parole recommendations have often been withdrawn based upon letters containing no new or additional information.[42] Defendants have themselves told inmates that they will be reconsidered for parole if they can get the protests withdrawn.[43]

The Board has based its parole decisions upon protests containing wrong informa-

---

**37.** Testimony of Jack Kyle, Trial Transcript June 24, 1992, at 14–15.

**38.** Testimony of Winona W. Miles, Class Cert.Hrg.Transcript, at 593; testimony of Jack Kyle, Class Cert.Hrg.Transcript, at 710.

**39.** Testimony of Jack Kyle, Class Cert.Hrg.Transcript, at 729; testimony of Winona W. Miles, Class Cert.Hrg.Transcript at 598; Deposition of Winona W. Miles, at 53–58, 121; testimony of Helen Copitka, Class Cert.Hrg.Transcript at 838–39; Plaintiff's Trial Exhibit No. 44, at 36–53, 61; Plaintiff's Trial Exhibit No. 45, at 55–73. Board employee Raven Kazen testified that out of her thousands of contacts with victims, she questioned the accuracy of only one letter. Trial Testimony, June 25, 1992, at 172–73. Further, of the hundreds of victim protest letters reviewed by Kazen, she never documented a single one as being vindictive or inaccurate. *Id.* at 170, 174.

**40.** A parole panel of the Board has statutory authority "to issue subpoenas requiring the attendance of such witnesses and the production of such records, books, papers and documents as it may deem necessary for the investigation of the case of any person before it." Tex.Crim.Proc. Code Ann. art. 42.18, § 12. Moreover, state law provides that:

It shall be the duty of any judge, district attorney, county attorney, police officer, or other public official of the state having information with reference to any prisoner eligible for parole to send in writing such information as may be in his possession or under his control to the department [TDCJ], upon request of any member of the Board of Pardons and Paroles or employee of the board or the department.

Tex.Crim.Proc.Code Ann. art 42.18 § 9(a) (slightly amended by Act of June 7, 1995, 74th Leg., R.S., ch. 321, § 2.006, 1995 Tex.Sess.Law Serv. 2806–07 (Vernon)).

Prior to the September 1, 1995 amendment, the information was directed to the "pardons and paroles division" of TDCJ and could be requested by an employee of the "pardons and paroles division"; now the word "department" is used in place of the words "pardons and paroles division." Despite the existence of this power, the evidence at trial is that an investigation is virtually never done by the Board.

**41.** Board Chairman Kyle testified that he would consider "new information" to be a new letter containing the same information as protests already in the file. Trial Transcript, June 24, 1992, at 14–15.

**42.** Former Chairman Neil Pfeiffer testified that he had seen "thousands" of such cases. Trial Transcript, June 23, 1992, at 36. Board Member Winona W. Miles was specifically questioned regarding the protest letters offered into evidence by Defendants regarding inmates Robert Harris, Solomon Henry, George Lewis, and Mark Fields. *See* Defendants' Trial Exhibit No. 55, Defendants' Trial Exhibit Nos. 10–11, Defendants' Trial Exhibit Nos. 6–8, and Defendants' Trial Exhibit No. 46, respectively. Ms. Miles was unable to identify any new information contained within these protest letters, all of which resulted in the withdrawal of a parole recommendation. Trial Transcript, June 24, 1992, at 94–114. Plaintiff's Trial Exhibit No. 78 contains the Minute Sheets of a dozen other inmates reflecting withdrawal of parole after receipt of a protest letter. Neither Miles nor any other defense witness could delineate any new and relevant information in any of said letters.

**43.** Testimony of George I. Lewis, Class Cert.Hrg.Transcript at 59–60; testimony of Solomon Henry, Class Cert.Hrg.Transcript at 104, 109; testimony Stanley K. Burks, Class Cert.Hrg.Transcript, at 209; and Plaintiff's Trial Exhibit No. 50 (letter to Robrady Adams from Winona W. Miles). Larance Yarbrough convinced the Travis County District Attorney's office to withdraw its protest of his parole, and he was paroled within months. Trial Transcript, June 25, 1992, at 252–53; Plaintiff's Trial Exhibit No. 89.

tion,[44] that are vindictive,[45] or that are the result of political pressure.[46] Many of the protest letters contained within the inmates' files refer to unadjudicated offenses.[47]

Defendants have relied on Texas Code of Criminal Procedure article 42.18, § 18 to prohibit inmates' access to information contained within parole files.[48] By denying inmates access to the information contained in protest letters which are placed in the inmates' parole files, inmates are denied the opportunity to respond to allegations contained within said protest letters or even to correct inaccurate information contained therein. Board employee Dan Guerra testified that it would be "fair" to get the inmate's response to information contained within the protest letters. Other witnesses, such as Winona W. Miles, admitted that getting the inmate's version would be "helpful."

### E. Legal Analysis

█ Texas law does not create a liberty interest in release on parole. *Williams v. Briscoe*, 641 F.2d 274, 277 (5th Cir.), *cert. denied*, 454 U.S. 854, 102 S.Ct. 299, 70 L.Ed.2d 147 (1981) (Texas parole statute does not create a protectable expectancy of release, as recognized in *Greenholtz v. Inmates of the Nebraska Penal & Correctional Complex*, 442 U.S. 1, 7, 99 S.Ct. 2100, 2104, 60 L.Ed.2d 668 (1979), but rather creates nothing more than a hope of parole); *Gilbertson v. Texas Board of Pardons and Paroles*, 993 F.2d 74, 75 (5th Cir.1993) (same); *Creel v. Keene*, 928 F.2d 707, 712 (5th Cir.), *cert. denied*, 501 U.S. 1210, 111 S.Ct. 2809, 115 L.Ed.2d 982 (1991) (same).

Having no constitutionally protected right, an inmate cannot state "a claim for either

44. *See* James W. Bright (letter submitted to the file refers to use of a weapon when the trial record contained no such references), Trial Transcript, July 16, 1992, at 24–25; Robrady Adams (protest letter referring to "other sexual offenses" when none existed on his record), Trial Transcript, June 9, 1992 at 42–46; Defendants' Trial Exhibit No. 42; Robert D. Harris (letter stating that his offense was committed during the course of a robbery, when the facts fail to support that), Trial Transcript, June 11, 1992, at 600–03; Defendants' Trial Exhibit No. 55; Levi Guzman (letter from trial official which clearly contradicted the testimony of the victim and prosecution witnesses at trial), Trial Transcript, June 11, 1992 at 771–76, Defendants' Trial Exhibit No. 60; Roger Fain (letter stated that Fain used a knife, contrary to the jury's verdict) Trial Transcript, June 11, 1992 at 562–565; Defendants' Trial Exhibit No. 54.

45. For example, inmate Jerry Mudd was protested by persons solicited by an attorney representing these persons in a civil lawsuit connected with Mudd's case. Testimony of James Granberry, Trial Transcript, June 25, 1992, at 76, 80–81; Plaintiff's Exhibit Nos. 84A and 84B. Helen Copitka testified as to an inmate that was protested by grandparents seeking to improve their legal position in their case seeking custody of the inmate's children. Trial Transcript, June 26, 1992, at 56–57. Terry R. Ralson was protested by his wife when he requested a divorce. Trial Transcript, June 10, 1992, at 214; Plaintiff's Exhibit No. 55. Phillip McCoy was protested by a former female TDC employee after he terminated his personal relationship with her. Trial Transcript, July 16, 1992, at 62. Billy Nix was protested by an attorney he had sued for legal malpractice. Class Cert.Hrg.Transcript, at 296–297. George Hall described an agreement reached

with the trial officials that they would not protest his parole. Trial Transcript, June 10, 1992, at 450–51. He also testified regarding the lawsuit he brought against those trial officials which resulted in the construction of a new county jail. The protest letters from his parole file that were admitted into evidence came from the trial officials. Defendants' Trial Exhibit No. 51.

46. *See* testimony of Dan Guerra, Board Member. Trial Transcript, July 16, 1992, at 46. Former Board Chairman James H. Granberry testified that he changed his recommendation for James D. Creel due to the "public outcry" protests received and that Granberry was not proud of his action. Trial Transcript, June 25, 1992, at 95–97. Plaintiff's Trial Exhibit No. 94 consists of form protests being solicited by an owner of a bar. Charles Dowden was protested as a result of the Orange County District Attorney's political campaign. Trial Transcript, June 9, 1992, at 481. Former Governor Mark White intervened in the case of Clyde Durbin. Trial Transcript, June 10, 1992, at 335; Defendants' Trial Exhibit No. 50.

47. The protest letter from Plaintiff Daniel Johnson's parole file, which was written by District Attorney Andy Tobias, refers to unadjudicated offenses in both Illinois and Texas. *See* Plaintiff's Trial Exhibit No. 40. The protest letter contained within Robrady Adams' file referred to other sexual offenses supposedly committed by Adams, despite the fact that he has no other arrests or convictions relating to sexual offenses. *See* Defendants' Trial Exhibit No. 42.

48. This statute, provided in full below, requires that all information relating to inmates who are eligible for parole and/or mandatory supervision be "privileged and confidential."

civil rights or habeas relief by his allegation that he was denied *due process* [when seeking parole] because he has no constitutionally protected expectancy of release." *Hilliard v. Board of Pardons & Paroles,* 759 F.2d 1190, 1192 (5th Cir.1985) (citing *Williams*) (emphasis added). Thus, neither Plaintiff nor the Plaintiff class have a claim for due process violations resulting from the Board's parole review procedures or the information considered by the Board when making parole decisions.

■ Plaintiff and Plaintiff class can, however, assert an equal protection claim in their civil rights suit.[49] In the Fifth Circuit's prior opinion in this case, *Johnson I*, the court stated, "[a]lthough the fourteenth amendment assures due process only if the state deprives a person of life, liberty, or property, it assures equal protection against all kinds of invidious state action, even those discriminations that do not encroach on liberty or property." *Johnson I*, 821 F.2d. at 1122. Inmates can present an equal protection claim in a § 1983 action in which they allege that, "without adequate justification, they were treated unfairly compared to other prisoners who were similarly situated." *Hilliard*, 759 F.2d at 1193.

In *Johnson I*, the Fifth Circuit determined that the Plaintiff and the Plaintiff class are not claiming the existence of an entitlement to parole release, but their claim "appears instead to be based primarily on an ill-defined equal protection argument advanced in behalf of all prisoners for whom 'discretionary' use of protest letters in parole determinations in fact represented invidious discrimination." *Johnson I*, 821 F.2d. at 1122.[50]

■ In this equal protection challenge, given the Fifth Circuit's determination that "convicted felons are not a constitutionally protected suspect class," rational basis scrutiny is used to test the challenged Texas statutes. *Hilliard v. Ferguson,* 30 F.3d 649, 652 (5th Cir.1994); *Williams v. Lynaugh,* 814 F.2d 205, 208 (5th Cir.1987). As stated above, no fundamental right is involved. Rational basis scrutiny is " 'offended only if the classification rests on grounds wholly irrelevant to the achievement of the state's objective.' " *Williams,* 814 F.2d at 208 (quoting *McGowan v. Maryland,* 366 U.S. 420, 425, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961)). "When a court reviews the constitutionality of a statute, it presumes the statute is valid." *HL Farm Corp. v. Self,* 877 S.W.2d 288, 290 (Tex.1994). "The party challenging the statute on equal protection grounds has the burden to show that the statutory classification is not rationally related to a legitimate state interest where interests other than fundamental rights or suspect classification are found." *Smith v. State of Texas,* 898 S.W.2d 838, 847 (Tex.Crim.App.), *cert. denied,* —— U.S. ——, 116 S.Ct. 131, 133 L.Ed.2d 80 (1995); *HL Farm Corp.,* 877 S.W.2d at 290.

The statutes at issue are Texas Code of Criminal Procedure articles 42.18, § 8 and 42.18, § 18, *Adult Parole and Mandatory Supervision Law,* and article 56.02, *Crime Victim's Rights.*[51] Plaintiff also questions Defendants' implementation of these statutes, which, in combination, allows the Board to receive and consider protest letters but prevents the inmate from learning of the existence of such letters, much less allowing the inmates to read and rebut the letters' contents.

The applicable sections of article 42.18, § 8 are set forth below: these sections require victims or their representatives, trial officials, and the sheriff to be notified of the prisoner's impending release on parole; to allow statements [protest letters and oral

---

**49.** Inmates can attack unconstitutional parole procedures of the Board in civil rights actions. *Allison v. Kyle,* 66 F.3d 71, 73 (5th Cir.1995); *Orellana v. Kyle,* 65 F.3d 29, 31 (5th Cir.1995); *Cook v. Texas Dept. of Crim. Justice Transitional Planning Dept.,* 37 F.3d 166, 168 (5th Cir.1994); *Johnson v. Pfeiffer,* 821 F.2d 1120, 1123–24 (5th Cir.1987) (*Johnson I*).

**50.** In *Johnson I*, finding that this case was properly brought as a civil rights suit and not re-

quired to be brought as a habeas action, the Fifth Circuit stated that if Plaintiff is successful, "[a]t most, the consequences of his suit would be a requirement that the Parole Board refrain from using unconstitutional customs, rules, and procedures when making parole decisions." *Johnson,* 821 F.2d at 1123.

**51.** The current versions of these statutes are set forth in this opinion.

statements] to be made; to require TDCJ to assemble all information relating to the prisoner, potentially including protest letters; and to require the Board to consider the statements.

Article 42.18, § 8(f)(2) states:

Before a parole panel considers for parole a prisoner who is serving a sentence for an offense in which a person was a victim, the pardons and paroles division, using the name and address provided on the victim impact statement, shall make a reasonable effort to notify a victim of the prisoner's crime or if the victim has a legal guardian or is deceased, to notify the legal guardian or close relative of the deceased victim. If the notice is sent to a guardian or close relative of a deceased victim, the notice must contain a request by the pardons and paroles division that the guardian or relative inform other persons having an interest in the matter that the prisoner is being considered for parole. The parole panel shall allow a victim, guardian of a victim, close relative of a deceased victim, or a representative of a victim or his guardian or close relative to provide a written statement.[52] *The parole panel shall also allow one person to appear in person before the board members to present a statement of the person's views about the offense, the defendant, and the effect of the offense on the victim. The person may be the victim of the prisoner's crime or, if the victim has a legal guardian or is deceased, the legal guardian of the victim or close relative of the deceased victim. If more than one person is otherwise entitled under this subdivision to appear in person before the board, only the person chosen by all persons entitled to appear as their sole*

*representative may appear before the board.*[53] This subsection may not be construed to limit the number of persons who may provide statements for or against the release of the prisoner on parole. The parole panel shall consider the statements and information provided in a victim impact statement in determining whether or not to recommend parole.[54] However, the failure of the pardons and paroles division to comply with notice requirements of this subdivision is not a ground for revocation of parole.

Tex.Crim.Proc.Code Ann. art. 42.18, § 8(f)(2) (as amended by Act of May 29, 1995, 74th Leg., R.S., ch. 253, § 1, 1995 Tex.Sess.Law Serv. 2179 (Vernon) (effective September 1, 1995) (emphasis added)).

Article 42.18, § 8(f)(3) states:

If a victim, guardian of a victim, or close relative of a deceased victim would be entitled to notification of parole consideration by the pardons and paroles division but for failure by that person to provide a victim impact statement containing the person's name and address, the person is nonetheless entitled to receive notice if the person files with the pardons and paroles division a written request for that notification. After receiving such a written request, the pardons and paroles division shall grant to the person all the privileges to which the person would be entitled had the person submitted a victim impact statement. Before a prisoner is released from the institutional division on parole or on the release of a prisoner on mandatory supervision, the pardons and paroles division shall give notice of the release to any person entitled to notification of parole consideration for

---

52. The underlined text was amended effective September 1, 1995. The statute, prior to September 1, 1995, read as follows: "If a hearing is held, the parole panel shall allow a victim, guardian of a victim, close relative of a deceased victim, or a representative of a victim or his guardian or close relative to provide a written statement." (emphasis noting deleted phrase)

53. These two sentences shown in italics were added by Act of May 29, 1995, 74th Leg., R.S., ch. 253, § 1, effective September 1, 1995. The statute contains no information how these "presented" statements are to be made, for example,

are they to be presented orally and/or in writing, is the hearing open at which statements are presented, can the inmate attend, are the statements to be recorded, and if so, can the inmate have access to these written statements, how is the Board to treat these oral statements, is this session to be a mini-trial? This amendment appears to require the Board to hold some sort of hearing [an act which was previously discretionary], presumably if the person desiring to make a statement requests a hearing.

54. This sentence remains unchanged.

the prisoner because the person filed with the pardons and paroles division a victim impact statement or a request for notification of a parole consideration.

Tex.Crim.Proc.Code Ann. art. 42.18, § 8(f)(3) (Vernon Supp.1996).

Article 42.18, § 8(h) states:

It shall be the duty of the pardons and paroles division at least 10 days before the board orders the parole of any prisoners or at least 10 days after recommending the granting of executive clemency by the governor to notify the sheriff, the prosecuting attorney, and the district judge in the county where such person was convicted and the county to which the prisoner is released that such parole or clemency is being considered by the board or by the governor. . . . The notice must state the prisoner's name, the county in which the prisoner was convicted, and the offense for which the prisoner was convicted.

Tex.Crim.Proc.Code Ann. art. 42.18, § 8(h) (Vernon Supp.1996).

Article 42.18, § 8(e) states:

Not later than the 120th day after the date on which a prisoner is admitted to the institutional division, the Texas Department of Criminal Justice shall secure all pertinent information relating to the prisoner, including but not limited to the court judgment, any sentencing report, the circumstances of the prisoner's offense, the prisoner's previous social history and criminal record, the prisoner's physical and mental health records, a record of the prisoner's conduct, employment history, and attitude in prison, and any written comments or information provided by local trial officials or victims of the offense.[55] The Texas Department of Criminal Justice shall establish a proposed program of measurable institutional progress that must be submitted to the board at the time of the board's consideration of the inmate's case for release. The board shall conduct an initial review of an eligible inmate not later than the 180th day after the date of the inmates's admission to the institutional division. Before the inmate is approved for release to parole by the board, the inmate must agree to participate in the programs and activities described by the proposed program of measurable institutional progress. The institutional division shall work closely with the board to monitor the progress of the inmate in the institutional division and shall report the progress to the board before the inmate's release.

Tex.Crim.Proc.Code Ann. art. 42.18, § 8(e) (Vernon Supp.1996) (emphasis added).

Additionally, although not specifically argued by the Plaintiff, article 56.02, Crime Victim's Rights, of the Texas Code of Criminal Procedure, allows a crime victim, guardian of a victim, or close relative of a deceased victim:

[T]he right to be informed, upon request, of parole procedures, to participate in the parole process, to be notified, if requested, of parole proceedings concerning a defendant in the victim's case, to provide to the Board of Pardons and Paroles [meaning either the Board or the TDCJ–Pardons and Paroles Division] for inclusion in the defendant's file information to be considered by the board prior to the parole of any defendant convicted of any crime subject to this Act, and to be notified, if requested, of the defendant's release[.]

Tex.Crim.Proc.Code Ann. art. 56.02(a)(7) (Vernon Supp.1996).

Article 42.18, § 8(f)(4) and § 42.18, § 18 require that information considered by the Board when making parole decisions be kept confidential. The sections are set forth below.

Article 42.18, § 8(f)(4) states:

Except as necessary to comply with this section [§ 8], the board or the Texas Department of Criminal Justice may not disclose to any person the name or address of a victim or other person entitled to notice under this section unless the victim or that person approves the disclosure or the board or department is ordered to disclose the information by a court of competent jurisdiction after the court determines that there is good cause for disclosure.

55. This sentence remains unchanged.

Tex.Crim.Proc.Code Ann. art. 42.18, § 8(f)(4) (Vernon Supp.1996).

Article 42.18, § 18, substantially modified in the 1995 Legislative Session, now states:

(a) Except as provided by Subsection (b), all information, including victim protest letters or other correspondence,[56] victim impact statements, lists of inmates eligible for release on parole, and arrest records of inmates, obtained and maintained in connection with inmates of the institutional division subject to parole, release to mandatory supervision, or executive clemency, or individuals who may be on mandatory supervision or parole and under the supervision of the pardons and paroles division, or persons directly identified in any proposed plan of release for a prisoner, is confidential and privileged.[57]

(b) This section does not apply to information regarding a sex offender if the information is authorized for release under Article 6252–13c.1, Revised Statutes.[58]

(b) Statistical and general information respecting the parole and mandatory supervision program and system, including the names of paroled prisoners, prisoners released to mandatory supervision, and data recorded in connection with parole and mandatory supervision services, is not confidential or privileged and must be made available for public inspection at any reasonable time.[59]

(c) On request of the governor, a member of the board, the Criminal Justice Policy Council in performing its duties of the council under Section 413.021, Government Code, or an eligible entity requesting information for a law enforcement, prosecutorial, correctional, clemency, or treatment purpose, the department may provide to the person or entity for that purpose information made confidential and privileged by this section.[60]

(d) In this section, "eligible entity" means:

(1) a government agency, including the office of a prosecuting attorney;

(2) an organization with which the Texas Department of Criminal Justice contracts or an organization to which the department provides a grant; or

(3) an organization to which inmates are referred for services by the Texas Department of Criminal Justice.[61]

Tex.Crim.Proc.Code Ann. art. 42.18, § 18 (as amended by Act of June 7, 1995, 74th Leg., R.S., ch. 321, § 2.011, 1995 Tex.Sess.Law Serv. 2809–10 (Vernon) (effective September 1, 1995) (emphasis added)).

Besides the statutory rights set forth above, Defendants argue that victims have a state constitutional right to participate in the parole process. Defendants are correct that Article 1, § 30 of the Texas Constitution provides for the rights of crime victims; however, it does not mandate that victims have input into parole proceedings but rather that they have a right to information regarding the release of the offender.[62] Further,

---

**56.** This phrase was added by Act of June 7, 1995, 74th Leg., R.S., ch. 321, § 2.011, effective September 1, 1995.

**57.** Before September 1, 1995, this phrase read "shall be confidential and privileged information and shall not be subject to public inspection." Tex.Crim.Proc.Code Ann. art. 42.18 § 18 (Vernon Supp.1995). The current version was created by Act of June 7, 1995, 74th Leg., R.S., ch. 321, § 2.011, effective September 1, 1995.

**58.** This subsection (b) was added by Act of May 29, 1995, 74th Leg., R.S., ch. 258, § 13, effective September 1, 1995. Article 6252–13c.1, provides for a sex offender registration program, an issue not applicable to the claims made in this case.

**59.** This subsection (b) was added by Act of June 7, 1995, 74th Leg., ch. 321, § 2.011, effective September 1, 1995. The change is to state that the listed information is *not* privileged or confidential. Both subsections (b) to article 42.18, § 18 were passed by the 74th Legislature and, because they are not in conflict, both remain operative as drafted.

**60.** This subsection (c) was added by Act of June 7, 1995, 74th Leg., R.S., ch. 321, § 2.011, effective September 1, 1995.

**61.** This subsection (d) was added by Act of June 7, 1995, 74th Leg., R.S., ch. 321, § 2.011, effective September 1, 1995.

**62.** Article 1, § 30 of the Texas Constitution, adopted November 7, 1989, provides in pertinent part:

(a) A crime victim has the following rights: (1) the right to be treated with fairness and with respect for the victim's dignity and privacy

article 56.02 allows a crime victim the right to be informed of and to participate in the parole process but does not state how such participation can occur. Article 56.08, amended to conform to amended article 42.18, § 8(f)(2), now also requires that a victim or his representative be notified early in the prosecution process of his right to appear before the Board.[63] Prior to the amendment which added this additional notice requirement, article 56.08 required that the victim be provided general information on the prosecution process, be notified of certain rights, such as the ability to receive compensation under the Crime Victims Compensation Act and obtain available social services, and of the right to file a victim impact statement, but no mention was made of a right to participate directly in the parole process.

Notwithstanding the perceived need for protest letters, as shown by the recent amendments to the Code of Criminal Procedure strengthening the right to make such letters, when reviewing the entire statutory scheme for parole, the function served by protest letters has been obviated by the enactment of certain statutory mandates. Upon the inmate's admission to the institutional division, TDCJ must assemble pertinent information relating to him, including any written comments or information provided by local trial officials or victims of the offense. Tex.Crim.Proc.Code Ann. art. 42.18, § 8(e). The Board must allow victims or their representative to submit statements, and must consider these statements, as well as the information contained in victim impact statements, when deciding whether to grant parole. Tex.Crim.Proc.Code Ann. art. 42.18, § 8(f)(2). The Board is also to consider the information assembled on the prisoner required by Tex.Crim.Proc.Code Ann. art. 42.09, §§ 8(a)(1)—(10), including information on the nature and seriousness of the offense, art. 42.09, § 8(a)(3). As part of this process, certain information is now presented to the Board which it did not previously receive when making parole decisions: the requirement for victim impact statements was not in place when this suit was filed on February 26, 1985,[64] and the requirement for information on the nature and seriousness of the offense was not in place when Plaintiff Daniel Johnson was convicted and transferred to TDCJ.[65]

throughout the criminal justice process; and (2) the right to be reasonably protected from the accused throughout the justice process.

(b) On the request of a crime victim, the crime victim has the following rights: (1) the right to notification of court proceedings; (2) the right to be present at all public court proceedings related to the offense, unless the victim is to testify and the court determines that the victim's testimony would be materially affected if the victim hears other testimony at the trial; (3) the right to confer with a representative of the prosecutor's office; (4) the right to restitution; and (5) the right to information about the conviction, sentence, imprisonment, and release of the accused.

(c) The legislature may enact laws to define the term "victim" and to enforce these and other rights of crime victims.

(d) The state, through its prosecuting attorney, has the right to enforce the rights of crime victims.

63. Article 56.08(a)(8) states:

(a) Not later than the 10th day after the date that an indictment or information is returned against a defendant for an offense, the attorney representing the state shall give to each victim of the offense a written notice containing: . . . (8) notification of the right of a victim, guardian of a victim, of close relative of a deceased victim, as defined by Section 8(f) of this code, to appear in person before a member of the Board of Pardons and Paroles as provided by Section 8(f)(2), Article 42.18 of this code.
Tex.Crim.Proc.Code Ann. art. 56.08(a)(8) (as amended by Act of May 29, 1995, 74th Leg., R.S., ch. 253, § 2, 1995 Tex.Sess.Law Serv. 2179–80 (Vernon) (effective September 1, 1995)).

64. Victim impact statements are mandated by Texas Code of Criminal Procedure Article 56.03. This article was effective September 1, 1985.

65. The compilation of information to be used by TDCJ and the Board relating to an inmate and his offense conviction was mandated by statute, Texas Code of Criminal Procedure Article 42.09, § 8, enacted approximately two years before this suit was filed in February 1985. However, Article 42.09, § 8 applies only to an inmate transferred to the TDCJ on or after October 1, 1987. Therefore, no "statement on the nature and seriousness of the offense," as required by Texas Code of Criminal Procedure Article 42.09, § 8(3), for consideration by the TDCJ and the Board when making a decision on his parole was compiled for Plaintiff Daniel Johnson because he was convicted and transferred initially to TDCJ [then TDC] in September 1977.

Victim impact statements allow the "victim of the offense, guardian of a victim, or a close relative of a deceased victim" to record the impact of the offense on the victim and his or her family, in terms of economic, physical or psychological loss, and to provide information on how to contact the victim or other persons, if needed, during the prosecution. Tex. Crim.Proc.Code Ann. art. 56.03(a) & (b) (Vernon Supp.1996). If a victim impact statement is made, a defendant and his or her counsel must be provided a copy of the statement prior to sentencing, with reasonable time given to read and comment on said statement, and, with court approval, to challenge any factual inaccuracies in the statement. Tex.Crim.Proc.Code Ann. art. 56.03(e) (Vernon Supp.1996).

When an inmate is transferred from a county facility to the TDCJ, certain documentation is transmitted with him, including a copy of the judgment; a copy of any order revoking community supervision [probation] and imposing sentence, including any amounts owed for restitution, fines and court costs and a copy of the client supervision plan, if one was prepared; a copy of the victim impact statement; a statement whether there was a change of venue in the case; a copy of the arrest record for each offense; if requested, information on the defendant's criminal history, including a state identification number if issued; a copy of the indictment or information for each offense; a copy of a presentence or postsentence investigation report; "a written report that states the nature and the seriousness of each offense and that states the citation to the provision or provisions of the Penal Code or other law under which the defendant was convicted"; and a checklist showing the required documents are accompanying the inmate. Tex. Crim.Proc.Code Ann. art. 42.09 §§ 8(a)(1)–(10) (as slightly amended by Act of June 7, 1995, 74th Leg., R.S., ch. 321, § 3.001, 1995 Tex.Sess.Law Serv. 2813–15 (Vernon) (effective September 1, 1995). The county also delivers to the TDCJ any revocation report, psychological or psychiatric evaluation of the defendant, any available social or psychological background information, and any additional information upon which the judge or jury based the punishment decision. Tex. Crim.Proc.Code Ann. art. 42.09, § 8(c) (Vernon Supp.1996, as slightly amended by Act of June 7, 1995, 74th Leg., R.S., ch. 321, § 3.001, 1995 Tex.Sess.Law Serv. 2813–15 (Vernon) (effective September 1, 1995)). TDCJ is not to take a defendant into custody from a county unless TDCJ's designated officer has certified the receipt of the above-described documentation. Tex.Crim.Proc. Code Ann. art. 42.09, § 8(b) (Vernon Supp. 1996, as slightly amended by Act of June 7, 1995, 74th Leg., R.S., ch. 321, § 3.001, 1995 Tex.Sess.Law Serv. 2813–15 (Vernon) (effective September 1, 1995)). TDCJ–ID shall make the above-described documents available to the TDCJ–Pardons and Paroles Division. Tex.Crim.Proc.Code Ann. art. 42.09, § 8(d) (Vernon Supp.1996). This section requiring that documentation be sent with a prisoner upon his or her transfer to TDCJ–ID was originally effective September 1, 1983.

■ The Defendants assert that Texas Code of Criminal Procedure, Article 42.18, § 8 and the Texas Constitution, Article 1, § 30 require the Board to consider protest letters, regardless of their content or motivation, and that Texas Code of Criminal Procedure, Article 42.18, § 18 forbids disclosure to inmates of the contents of any protest. Separately, the statutes allowing victim protest letters to be received and considered by the Board and mandating that an inmate's parole file be kept confidential each meet rational scrutiny; however, the interplay of the statutes, without some sort of savings provision, causes an equal protection violation. As such, the statutes allowing protest statements to be received and considered by the Board and mandating that an inmate's parole file be kept confidential are hereby found unconstitutional and Defendants are prospectively enjoined from following or applying said statutes.

The evidence clearly shows that inmates who receive protest letters of any kind are treated differently from those who do not. Obviously, an inmate's potential for receiving

protest letters is unpredictable; [66] this fact, coupled with the unpredictability of the contents of those letters, leads to disparate results among prisoners eligible and being reviewed for parole. A system has been created which is extremely arbitrary and capricious and which violates the equal protection rights of the Plaintiff and the Plaintiff class, [67] no matter how small the number of parole candidates are adversely affected by protest letters.

Regardless of the source of protests, almost all of the letters introduced into evidence have little or nothing to do with the two statutory factors that the Board is to consider when making parole decisions, i.e., the seriousness of the offense and the likelihood of a favorable parole outcome. Tex. Crim.Proc.Code Ann. art. 42.18, § 8(f)(5) (Vernon Supp.1996). Even presuming that information provided by protest letters is new and factual, the Board has no rule guiding the exercise of its discretion when determining how to use this information when making parole decisions. Under the Board's present system, information provided in written statements is not checked for accuracy nor supplied to the inmate for rebuttal. Additionally, after September 1, 1995, oral statements of the victim's or his representative's "views about the offense, the defendant, and the effect of the offense on the victim" can be presented to the Board without any requirement that the inmate be informed of such oral statements or that he be present to rebut the same. Such unbalanced,

one-sided procedures virtually guarantee that false information will be used. [68]

Alternatively, the statutes, now silent as to whether a hearing is required, could be read as not *prohibiting* a hearing. Prior to the September 1, 1995 amendments, only article 42.18, § 8(f)(2) mandated that a hearing be held before protest letters could be taken and considered. All other references to "statements" in the applicable statutes contain no such condition precedent: article 42.18, § 8(f)(2) simply states in a subsequent sentence (which was not amended) that "[t]he parole panel shall consider the statements and the information provided in the victim impact statement in determining whether or not to recommend parole;" and article 42.18, § 8(e), mandating that TDCJ "secure all pertinent information relating to the prisoner, including but not limited to ... any written comments or information provided by local trial officials or victims of the offense," is silent as to the method of handling this information to the extent that it includes protest statements. Thus, it is possible to read a requirement into the statutes, as currently written, that the Board hold a hearing, attended by the inmate, to review the protest statements before said statements can be used by the Board in its parole decision-making process. [69] Under this interpretation, if Defendants choose not to hold parole review hearings, protest statements of any form, written or oral, from any person or entity, should not be placed in an inmate's

**66.** The Court notes that protest letters can be submitted by victims as well as trial officials and that trial officials' letters also contain unauthenticated information.

**67.** Inmate Harvey Stewart, when asked whether he perceives the parole process as being fair as a whole, replied that "it's whim and fancy ... [w]ith maybe a little ego mixed in...." Class Cert.Hrg.Transcript, at 367.

**68.** Under the previous language of article 42.18, § 8(f)(2) that "[i]f a hearing is held, the parole panel shall allow a victim ... to provide a written statement," the Court could have determined that the Defendants' system of considering protest letters when making parole decisions without first having held a hearing was a misinterpretation and misapplication of the law. The constitutionality of the statutes could have been saved by the Court's reading the statutes as requiring a hearing be held if protest letters are considered

in the parole decision. This would allow the Board to choose and either adopt a rule prohibiting the use of protest letters or, if said letters would be used, requiring a parole hearing be held, and within a reasonable period of time before the hearing, requiring that the inmate be informed of the letters' contents and the writer's identity and provided an opportunity to present rebuttal arguments to the letters' contents at said hearing.

**69.** This hearing requirement would entail the following: the prisoner is informed of the letters' contents and the writers' identities within a reasonable period of time before the hearing, he is allowed an opportunity to investigate and rebut the contents of said letters, and the prisoner is allowed to present his rebuttal information to the Board at the hearing.

file nor considered when the Board makes parole decisions. However, given the Legislature's expressed intent to delete the condition precedent that a hearing be held before protest statements can be accepted and considered, this Court refuses to make a strained reading of the affected statutes in order to find them constitutional.

█ Likewise, the statutes requiring the identity of victims and the contents of parole files be kept confidential each separately meet the rational scrutiny test; however, when these statutes operate in combination with the statutes allowing protest statements to be received and considered without rebuttal, equal protection violations occur. Article 42.18, § 8(f)(4) requires that the identity of victims or other persons entitled to notice of the inmate's proposed release on parole not be disclosed. Despite the fact that § 8(f)(4) contains an exception to this nondisclosure rule by having language which states that identities are not to be disclosed "[e]xcept as necessary to comply with this section [§ 8]," because the subsections of article 42.18, § 8 relating to protest letters are found to be unconstitutional, article 42.18, § 8(f)(4) must also fall. Article 42.18, § 18 causes an equal protection violation to the extent that it protects protest letters from disclosure to the affected inmate.[70] The Board cannot use

written or oral statements, as allowed by article 42.18, § 8(f)(2), when making parole decisions unless the inmate has had a meaningful opportunity to review the statements and present rebuttal arguments, such as in a parole hearing. *See Sandin v. Conner,* —— U.S. ——, ——, 115 S.Ct. 2293, 2302, 132 L.Ed.2d 418 (1995).[71]

An alternate remedy to finding all of the affected statutes unconstitutional would require that the content of the protest letters be verified. However, Defendants argue strenuously against any type of administrative procedure which would require the Board to investigate and attempt to verify information contained in protest letters; thus, this form of alternative relief is not available for the Court to award.[72] Given the Board's practical procedure to not hold parole review hearings, at least before September 1, 1995, a prohibition on the receipt of statements [protest letters] must be ordered, because inmates are not allowed to review or rebut information in their parole file.

The Court hereby determines that the statutory scheme under which the Board can accept statements, whether written or oral, and then prevent knowledge of said statements' existence and prohibit disclosure of their contents and of the writer's or speak-

---

**70.** Presumably, if article 42.18, § 8 was read as not prohibiting a hearing and this court determined that its proper interpretation was to read in the requirement that a hearing be held, article 42.18, § 8 could also be saved. Under this interpretation, only those protest letters which the inmate had reviewed and been allowed to rebut at a parole hearing would be included in the inmate's file. No harm would be done to the confidentiality of the remainder of the parole file because the inmates would have no right of access to this other information.

**71.** The United States Supreme Court recently found that a Hawaii prison regulation provided procedural protection to the inmate at his parole hearing by allowing him to explain the circumstances behind his misconduct record although neither the state regulation nor the Due Process Clause afforded him a protected liberty interest sufficient to entitle him to the procedural protections set forth in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

**72.** Defendants have taken the position that the Board will not develop a system to review and verify protest letters because such an administra-

tive procedure would be "impractical, costly, unfair to victims and result in the same result that weeks of testimony in this case [*Johnson v. TDCJ, et al.*] has produced, namely that protest letter information of the type relied on by the Board is reliable and relevant." *See* Defendants' Amended Post–Trial Brief Submitted under Seal filed August 17, 1992, at 12. Based upon the testimony of Bob Owens, Defendants further state that "[g]iven the relatively infrequent denial of parole due to a protest letter, a formal system-wide investigative and hearing process is unnecessary and impractical. Such a system moreover, cannot be achieved without violating both the spirit and letter of the Crime Victim's Bill of Rights," and would disclose the identity of the protestant to the inmate. Amended Brief at 13.

Instead, Defendants argue that the information which should be verified is that information given by the inmate to the Board when interviewed for parole. However, the information from the inmate need no longer be relied upon because accurate information on the case is provided to TDCJ–ID and the Board in the inmate's documentation packet required under Texas Code of Criminal Procedure article 42.09.

er's identity, violates the equal protection rights of inmates because the Board, as a rule, denies parole to inmates who have received protest statements. The Board's sole function is to determine whether an inmate should be released on parole; its function is not to effectively re-try the case by accepting "testimony" which was inadmissible at trial on evidentiary grounds (or would have been inadmissible had introduction been attempted) or was excluded as part of trial strategy, or by entering findings which the actual jury did not find at the inmate's trial. Evidentiary determinations are to be made in the trial court. The Board is not to consider unadjudicated offenses or offenses extraneous to the conviction for which the inmate is currently incarcerated.[73] The Board must be bound by the conviction which the inmate received and must apply the statutory requirements regarding the time to be served on parole for that conviction, without adding ad hoc information which results in additional time being served.

This memorandum opinion is not to be construed as a statement that this Court considers the offenses committed by parole candidates whose rights are affected by this opinion any less egregious or as not against the bounds of societal limits. However, victims, their relatives, and other concerned individuals must direct their protests to the legislative branch of government—if the range of punishment for a particular crime or the amount of time an offender must serve incarcerated for the commission of that crime is believed to be too lenient, the protests must go to elected government officials. Protest statements cannot be used to make an "end-run" around disliked statutory mandates by causing an inmate to serve a greater portion of his sentence (although he is otherwise eligible for parole under statutory calculations) through the use of secret and unverified protest statements.

Until the laws governing the use of protest statements in parole decisions meet constitutional requirements (and no longer cause equal protection violations), the Board shall adopt a rule which states that protest statements, whether in written or oral form, shall not be accepted or considered by the Board for any purpose when making parole decisions. Further, said rule shall state that such protest statements shall not be placed in the inmate's file. This rule shall apply prospectively to all inmates considered for parole after the date of the original opinion filed November 1, 1995.

## IV. CONSIDERATION OF FURLOUGHS AS A PAROLE FACTOR

### A. How the System Works

A furlough is a temporary release from the TDCJ–ID for certain reasons, such as to obtain medical diagnosis or treatment, to obtain treatment and supervision at a Texas Department of Mental Health and Mental Retardation facility, to attend a funeral, or to visit a critically ill relative. The statute allowing for furloughs was substantially amended, effective September 1, 1995. The amendments change the name of "furlough" to "emergency absence," [74] decrease the occasions for which furloughs are granted, for example, furloughs are now granted only for the above-listed events and TDCJ–ID's discretion to grant a furlough for an appropriate reason was deleted, and require that the inmate be under physical guard while absent. Tex.Gov't Code Ann. § 501.006 (as amended by Act of June 7, 1995, 74th Leg., R.S., ch. 321, § 1.074, 1995 Tex.Sess.Law Serv. 2792–93 (Vernon) (effective September 1, 1995)). Now, TDCJ–ID is to adopt policies [formerly rules] for the administration of emergency absences under escort. *Id.* Under the rules which existed before September 1, 1995,[75] some inmates are barred from obtaining furloughs during the period of their confinement because of the nature of their offense or

---

**73.** If the Board is not to consider voided prior convictions against the inmate in future parole proceedings, the Board is not to consider unadjudicated offenses in parole review hearings. *Cook v. Tex. Dep't of Criminal Justice Planning Dep't,* 37 F.3d 166, 168–69 (5th Cir.1994).

**74.** This opinion will still refer to the prior term of "furlough."

**75.** This Court presumes that the rules are still effective after the substantial amendment of Texas Government Code § 501.006, the parties having provided no information to the contrary.

other factors. All inmates approved for furlough must arrange for a "placement" within the boundaries of the State of Texas.[76]

Given the small chance that an inmate will be approved for an emergency absence, and because he must make the trip under guard, the value of an inmate's furlough history, at least after September 1, 1995, has been significantly decreased as a factor indicating a parole candidate's likelihood of success on parole. To a large extent, the Plaintiff's claim that out-of-state inmates' equal protection rights are being violated because said inmates cannot qualify for a furlough (because they cannot establish an in-state placement), yet their furlough history is used as a parole factor, has been mooted by the significant statutory amendment decreasing the opportunity for furloughs for all inmates. However, it is possible that the Board will consider an inmate's completion of an "emergency absence" as a factor in the parole decision. It is possible that inmates will only be granted an emergency absence if travel is limited to locations in Texas, thus requiring an in-state placement. As such, the following analysis, included in the original opinion dated November 1, 1995, is included with only slight revision.

### B. Plaintiff's Argument

Plaintiff urges this claim on behalf of all out-of-state inmates incarcerated in Texas (including Plaintiff Daniel Johnson). Plaintiff argues that the Defendants invidiously discriminate against inmates who are not Texas residents by considering the completion of a furlough as a positive factor in the parole decision. Because, as a practical matter, furloughs are available only to Texas residents, Defendants follow a procedure which provides state residents with an unfair advantage in parole considerations. Thus, Defendants violate rights guaranteed by the equal protection clause and the privileges and immunities clause of the Constitution, as well as 42 U.S.C. § 1983. Plaintiffs request that the Board adopt by rule a policy that completion of a furlough, including an appli-

cation for and denial of a furlough, is irrelevant to the parole decision. They request that the Board have a policy under which only unsuccessful furloughs are considered.

### C. Defendants' Argument

Defendants argue that the Board has no role in the decision to grant furloughs because that decision is made solely by TDCJ–ID. Defendants argue that the challenged action of granting furloughs does not classify or distinguish between two or more persons or groups, i.e., the action cannot be said to violate equal protection. Defendants argue that the TDCJ–ID uses the same criteria for furlough eligibility, thus, similarly situated persons (inmates who are incarcerated in Texas) are treated alike and no distinctions are made between in-state and out-of-state furlough candidates. The fact that the application of the same furlough criteria produces differing results between in-state and out-of-state inmates (due to a lack of in-state placements for out-of-state inmates) does not cause an equal protection violation. Additionally, Defendants argue that the inability to obtain a furlough is not considered against an inmate in the parole evaluation process. They assert that testimony shows an inmate's furlough record (whether granted or denied) is insignificant; only a negative result from a furlough (such as a new offense having been committed while on furlough or the inmate's failure to return) is considered against an inmate for parole evaluation purposes. Defendants assert that the Plaintiff failed to present witness testimony of any inmate denied a furlough due to his non-residency, and that Plaintiff Daniel Johnson, being a Texas Code of Criminal Procedure art. 42.12, § 3g(a)(1)(E) offender, does not qualify for furlough consideration, making him ineligible as a class representative to assert this claim for the class. Additionally, they argue that there is no protected liberty interest in a furlough.

### D. Analysis

It is uncontroverted that the Board has no role in the decision to grant or deny furloughs, such decisions are solely made by

---

**76.** Again, this Court does not know how the amendment to Texas Government Code § 501.006 to require escorted emergency ab-

sences has impacted the need for an in-state placement before an emergency absence can be granted.

TDCJ–ID.[77] Further, only a very small percentage of inmates ever obtain a furlough.[78] The Board has no policy concerning the consideration or weight to be given to the completion of furloughs in the parole decision process.[79]

Successful completion of a furlough is a positive factor in the parole decision.[80] Numerous inmates testified that they were told by Parole Board employees that obtaining a furlough would help them make parole.[81] Testimony was submitted showing that in-

**77.** Andy Collins, Class Cert.Hrg.Transcript at 668–671.

**78.** Andy Collins, Trial Transcript, June 24, 1992, at 295, 297.

**79.** Jack Kyle testified that there is no policy to guide Board members in their consideration of furloughs. Class Cert.Hrg.Transcript, at 726. Chairman Kyle also testified that whether an inmate received a furlough is not relevant to the parole decision. Trial Transcript June 23, 1992, at 223. Kyle later testified that completion of a furlough is considered as a factor, though not a "significant factor" in the parole decision making process. Trial Transcript, June 24, 1992, at 7. Board Member Kenneth N. Coleman testified that a policy prohibiting furlough information from going into parole files "won't bother him." Class Cert.Hrg.Transcript, at 655.

Board Member Winona W. Miles testified that there is no policy regarding the use of furloughs. Trial Transcript, June 24, 1992, at 122, 165. *See also,* Plaintiff's Exhibit No. 98, at 25; Plaintiff's Exhibit No. 44, at 94; Plaintiff's Exhibit No. 45 at 74–76; Plaintiff's Exhibit No. 46, at 110; testimony of Winona W. Miles, Class Cert.Hrg.Transcript, at 598; and testimony of Kenneth N. Coleman, Class Cert.Hrg.Transcript, at 621.

**80.** Plaintiff's expert witness, Helen Copitka, a former Parole Commissioner, testified that whether an inmate obtained a furlough had been important to her in the performance of her duties. Class Cert.Hrg.Transcript, at 850. She also testified that during the time she served as a Parole Commissioner, some Board members considered the completion of a furlough to be a positive factor. *Id.* at 851. Former Chairman Neil Pfeiffer testified that furloughs were a plus (Trial Transcript June 23, 1992, at 62), as did former Chairman James H. Granberry. Trial Transcript June 25, 1992, at 111; testimony of former Board Member Chris A. Mealy, Trial Transcript, June 25, 1992, at 203–04. Dan Guerra, a Board Member for fifteen years, testified that the completion of a furlough is a "positive factor" in the parole decision. Trial Transcript, July 16, 1992, at 48. *See also* Plaintiff's Exhibit No. 44, excerpts from the Oral Deposition of Chris A. Mealy, at 84–86; Plaintiff's Exhibit No. 45, excerpts from the Oral Deposition of Henry Keene, at 74–76; Plaintiff's Trial Exhibit No. 46, excerpts from the Oral Deposition of Stennett D. Posey, at 109–110; Plaintiff's Trial Exhibit No. 47.

Plaintiff's Exhibit No. 72, consisting of the Minutes for the Board of Pardons and Paroles meeting held December 9, 1986, includes as an attachment a memorandum prepared by John W. Byrd, former Executive Director, concerning review of proposed legislation; the memo includes the statement, "Considering the significance placed on furloughs by parole officials, new legislation introduced eliminating eligibility for furloughs should be reviewed."

Parole Examiner Steve Farmer testified that whether an inmate had been on furlough was a standard question included in parole interviews. The case summary prepared by Farmer regarding Inmate Kenneth G. Thompson, Defendant's Trial Exhibit No. 53, does indeed reflect the fact that Farmer asked Thompson this standard question regarding furloughs. Inmate testimony reflects that parole interviews almost always include a question regarding completion of a furlough, whether the inmate is eligible for a furlough or not. Plaintiff Daniel Johnson's parole file contains numerous documents stating that he had not been on a furlough. *See* Plaintiff's Exhibit No. 75, at Bates Nos. 00235, 00239, 00291, 00330, and 00340. These documents were generated and placed in Johnson's file by Board employees, in contravention of Jack Kyle's testimony that he "wouldn't even know" how information regarding furloughs would find its way into the files.

However, Defendants' witnesses stated that an inmate's furlough record, whether granted or denied, is of little or no significance; furlough history is only important to the Board if a furloughed inmate commits an offense while on furlough or fails to return. Winona Miles, Trial Transcript, June 24, 1992, at 122–26; Jack Kyle, Trial Transcript, June 23, 1992, at 223; Andy Collins, Trial Transcript, June 24, 1992, at 288; Daniel Downs, Trial Transcript, June 26, 1992, at 186.

**81.** Inmate Louis Wright testified that Board Member Neil Pfeiffer told him that "he would be paroled if he could make a couple of furloughs." Trial Transcript, June 9, 1992, at 83–84. Inmate Terry R. Ralson was told in 1983 by a parole counselor that the Parole Board would "look favorably on furlough." Trial Transcript, June 10, 1992, at 216. *See also* Class Cert.Hrg.Transcript, at 11–12, 137, 245; Class Cert.Hrg.Transcript, at 280–81, 329, 349, 432; Trial Transcript, June 10, 1992, at 358, 359, 453; Trial Transcript, June 25, 1992, at 238; Trial Transcript, June 16, 1992, at 26–27.

Other inmates also testified that they were told by Board members or Board employees that obtaining a furlough would enhance their chances for making parole: Clyde Durbin was told by

state inmates have an easier time securing a furlough because they can obtain a suitable in-state placement with family or friends, while out-of-state inmates must have family or friends temporarily relocate in Texas to establish an in-state residence to serve as that inmate's in-state placement—an out-of-state placement is not allowed.[82]

Despite the fact that a successful furlough allegedly helps an inmate's parole chances, as a remedy, Plaintiff requests that the Board adopt a rule which prohibits consideration of a successful completion of a furlough in the parole decision-making process and which prohibits inquiry into whether the inmate has obtained, applied for, or been denied a furlough. Under the Plaintiff's remedy, the only entry into an inmate's parole file regarding his or her furlough history would be a notation stating that the inmate had *unsuccessfully* completed a furlough. However, if

the Board adopted such a rule, the result would adversely affect in-state inmates who, as a practical matter, can more easily secure an in-state placement as a furlough prerequisite. This requested remedy would unfavorably affect in-state inmates and favorably affect out-of-state inmates; i.e., the reverse of the current situation would occur and would possibly give rise to in-state inmates' claims for alleged discrimination.

■ Plaintiff did show that out-of-state inmates are less likely to be granted furloughs because their families and friends reside out-of-state and must establish a new residence inside Texas to serve as an in-state placement.[83] However, this alleged "unequal treatment" is actually an "unequal result" of furlough criteria applied equally to all inmates incarcerated at TDCJ–ID. There is no "extra" set of criteria for out-of-state inmates.[84] Out-of-state inmates may be grant-

Commissioner Paul J. Mansmann in 1981, and former Board Chairman Ruben Torres, in 1984, that obtaining a furlough would be helpful, Trial Transcript, June 10, 1992, at 358–59; Mark Fields testified that, one of the first questions "asked every year" regarded furloughs, Trial Transcript, June 9, 1992, at 181–82; Levi Guzman testified that Connie Jackson told him in 1984 that a furlough would help his chances of making parole, Trial Transcript, June 11, 1992, at 810–11; Walter L. Morris testified that Ken Casner told him making a furlough would help get a favorable recommendation in 1986, Class Cert.Hrg.Transcript, at 10–12; Harvey Stewart testified that he had been told that he needed to go on furlough in order to make parole—he obtained a furlough and was paroled shortly thereafter, Class Cert.Hrg.Transcript, at 371. *See also* Plaintiff's Trial Exhibit No. 47.

Plaintiff's expert witness, William T. Habern, testified that the successful service of a furlough was a positive consideration in the parole decision. Trial Transcript, June 26, 1992, at 22.

82. William T. Habern testified regarding the efforts of inmate Jeffrey Licker, a Florida resident, to obtain a furlough. Despite the fact that his family came to Texas and leased a home, and made arrangements with the local sheriff to provide some supervision for Licker, the furlough was still denied. *See*, Class Cert.Hrg.Transcript, at 181–183; Helen Copitka testimony, Class Cert.Hrg.Transcript, at 854. James A. Collins testified as to the "additional problems" involved for out-of-state families. *See* Class Cert.Hrg.Transcript, at 686.

Defendants offered their Exhibit No. 65, which consisted of travel cards for eleven supposedly out-of-state inmates who were granted furloughs:

in at least three of the eleven cases, the inmates had family residing within the state of Texas, which would have been appropriate placements; for the remaining cases, there was no way to determine whether the inmates had suitable placements or relatives within the State of Texas for their furloughs. Plaintiff argues that there is no showing of an in-state furlough being granted to a temporarily relocated out-of-state family or friends.

Inmates testified that they were told by either Board employees or TDC employees not to bother applying for a furlough because their families resided outside of Texas. James D. Creel testified that the "unofficial" word was that out-of-state inmates were not being furloughed. Class Cert.Hrg.Transcript, at 330. Kenneth G. Thompson testified that his request for a furlough was denied due to the fact that his family lived out-of-state; Philip McCoy testified by deposition that he was told he would not be granted a furlough due to the nature of his offense and the fact that he was from out-of-state. Plaintiff Daniel Johnson was discouraged from applying for a furlough due to the fact that his family lived in from Illinois. Class Cert.Hrg.Transcript, at 781.

83. No inmate qualifies for an out-of-state furlough because the state has reasonably determined it cannot adequately maintain custody and control, both physical and legal, over an inmate allowed to furlough out-of-state. Andy Collins, Class Cert.Hrg.Transcript, at 679.

84. On September 12, 1989, TDCJ–ID amended its "Temporary Furlough Review Procedures" which set forth conditions for an inmate's release on furlough, such conditions include the require-

ed furlough so long as they meet all requirements, including having an in-state placement.[85] Plaintiff has failed to demonstrate that the Board or any TDCJ–ID official has unconstitutionally discriminated against any non-resident inmate regarding any grant or denial of a furlough.

■ The equal protection clause of the Fourteenth Amendment requires no more than that persons similarly situated be treated alike. If the challenged government action does not classify or distinguish between two or more persons or groups, as in this case, then the action does not violate equal protection. *Brennan v. Stewart,* 834 F.2d 1248, 1257 (5th Cir.1988). Equal protection requires equal laws, not equal results. *Personnel Adm'r of Mass. v. Feeney,* 442 U.S. 256, 271–72, 99 S.Ct. 2282, 2292, 60 L.Ed.2d 870 (1979). In *Feeney,* the United States Supreme Court stated:

> Most laws classify, and many affect certain groups unevenly, even though the law itself treats them no differently from all other members of the class described by law. When the basic classification is rationally based, uneven effects upon particular groups within a class are ordinarily of no constitutional concern.... In assessing an equal protection challenge, a court is called upon only to measure the basic validity of the legislative classification.

*Id.*

■ Defendants argue that Plaintiff Daniel Johnson is a "3g" offender and does not meet the criteria for furlough consideration; therefore, he does not have standing to assert the furlough claim on behalf of the class. At the time he was convicted in September of 1977, there was no such classification as a Texas Code of Criminal Procedure art. 42.12 § 3g offender.[86] At the time this suit was filed in February 1985, Plaintiff Johnson was eligible for furlough consideration, however, after TDCJ–ID criteria for furlough eligibility was revised in September 1989, Plaintiff Daniel Johnson became ineligible for furlough consideration. Having no personal stake in this claim when the class certification was granted in February 1992, Plaintiff Daniel Johnson is not an appropriate class

---

ments that the applicant be a state approved trusty, who is within twelve months of becoming eligible for parole, and who is non–3g (non-aggravated) offender, etc. *See* Plaintiff's Class Cert.Hrg. Exhibit 13, TDCJ–ID Administrative Directive, AD–04.56 (rev. 2). The policy makes no distinction whatsoever between in-state and out-of-state inmate furlough candidates.

**85.** Defendants' Trial Exhibit 65, being travel cards of non-resident inmates who have been granted furloughs; Andy Collins, Trial Transcript, June 24, 1992, at 235–49, 266.

**86.** The predecessor of article 42.12, § 3g, being article 42.12, § 3f, was effective September 1, 1977, and applies to offenses committed after that date. In 1979, the section became § 3g. Plaintiff Daniel Johnson was not sentenced under article 42.12, § 3g because he committed his offense before September 1, 1977, however, he committed an offense (sexual assault) which is now listed as a § 3g(a)(1)(E) offense. Administrative Directive AD–04.56 was initially promulgated in September 1987, and then amended in September 1989 [TDCJ–ID Administrative Directive AD–04.56 (rev. 2)] to eliminate persons convicted of aggravated sexual assault from furlough consideration. Because Administrative Directive AD–04.56 was not in existence when this suit was filed in February 1985, Plaintiff Johnson was then eligible for furlough consideration.

However, under AD–04.56, he is no longer eligible for furlough.

The original motion for class certification was made with the Plaintiff's complaint in February 1985, the opinion of the district court dismissing the case for failure to state a claim and failure to exhaust state remedies was reversed and remanded with instructions by the Fifth Circuit in July 1987, immediately thereafter the Plaintiff reurged his motion for class certification, an attorney for the Plaintiff was appointed June 20, 1988, a Fourth Amended Complaint was filed in September 1988 together with a motion for class certification, that motion for class certification was amended in October 1991, and, after a hearing, a class was certified on February 11, 1992 "for prospective, injunctive relief only, consisting of all present and future inmates of the TDCJ–ID." The class certification was amended on March 25, 1992 to certify the class under Fed. R.Civ.P. 23(b)(1) and (b)(2). Defendants have raised the argument that Plaintiff Daniel Johnson has no standing as the class representative to bring the furlough claim because, being convicted of an aggravated offense, he is not eligible for furlough consideration under AD–04.56. Plaintiff does not rebut this assertion in his reply brief but merely states that criteria imposed by TDCJ–ID is not at issue but the issue is whether out-of-state inmates are denied access to a "positive" parole factor resulting from a successful furlough completion.

representative. *See Rocky v. King,* 900 F.2d 864, 867 (5th Cir.1990).

■ Despite Plaintiff Johnson's lack of standing as a class representative, the Court will rule on the merits of this claim because the class of out-of-state inmates, whose members are eligible both for furloughs and for parole is a party to this case, and the class has raised an equal protection claim related to the Board's consideration of furloughs when making parole decisions. The furlough claim has been vigorously litigated throughout all testimony, argument, and briefing. This Court has previously denied the Defendants' request for Plaintiff Johnson's dismissal as the class representative, based upon the reasons stated above and because neither he nor the Plaintiff class should be penalized for the Court's delay (due to an overcrowded docket) in ruling on the motion for class certification. *See* Order denying Defendants' Motion to Dismiss and for Summary Judgment, filed December 18, 1991, at 9–10.

This Court will not order the Board to adopt a rule which prohibits consideration of an inmate's emergency absence or furlough history, except for unsuccessfully completed emergency absences or furloughs, when the Board makes parole decisions. It will not invade the Board's discretionary authority to consider an inmate's entire emergency absence and/or furlough history. Obviously, when evaluating an out-of-state inmate for parole, it is common sense that the Board will not negatively consider the out-of-state inmate's inability to obtain an emergency absence or a furlough because he can not establish an in-state placement.

### V. *Dismissal of the Board of Pardons and Paroles and the Texas Board of Criminal Justice*

■ The Texas Board of Pardons and Paroles and the Texas Board of Criminal Justice should be dismissed as party defendants under Eleventh Amendment immunity. The Eleventh Amendment generally divests federal court of jurisdiction to entertain suits directed against states. *Port Auth. Trans–Hudson v. Feeney,* 495 U.S. 299, 304, 110 S.Ct. 1868, 1871, 109 L.Ed.2d 264 (1990). A plaintiff may only maintain a § 1983 suit against official capacity state officials for pro-

spective, injunctive relief. *See Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). As such, the State of Texas and the state entities must be dismissed. Prospective, injunctive relief will be awarded to Plaintiff class against the members of the Texas Board of Pardons and Paroles and the members of the Texas Board of Criminal Justice in their official capacities as Defendants.

### VI. *APPOINTMENT OF COURT MONITOR*

The Plaintiff requests that this Court appoint a monitor to oversee and enforce compliance with the procedural changes in the parole process that the Court has ordered today. However, the Court finds that it will not appoint a monitor because to do so would be unnecessarily burdensome and expensive to Defendants. If TDCJ or the Board violates any of the ordered changes, aggrieved inmates have a remedy through the courts.

### VII. *CONCLUSION*

Prospective and injunctive relief as of the date of the original opinion (November 1, 1995) is hereby granted to the class of all present and future inmates of the Texas Department of Criminal Justice—Institutional Division, against Defendants, being the members of the Texas Board of Pardons and Paroles and the members of the Texas Board of Criminal Justice, all having been sued in their official capacities, on the issues of the Texas Board of Pardons and Paroles' consideration of inmates' writ-writing activities and the Board's receipt of protest letters when making parole determinations, as more fully stated above. Relief is hereby denied to the Plaintiff class as to its claim against the said Defendants related to the Texas Board of Pardons and Paroles' consideration of emergency absence and/or furlough history when making parole determinations, as more fully stated above.